412 So.2d 186 (1982)
Warren[1] O. CHESSON, Sr. and Dories Chesson, Plaintiffs-Appellees,
v.
AMERICAN HARDWARE MUTUAL INSURANCE COMPANY, et al., Defendants-Appellants.
No. 8676.
Court of Appeal of Louisiana, Third Circuit.
March 10, 1982.
*187 Warren D. Ponder, Baton Rouge, for plaintiffs-appellants.
Brame, Bergstedt & Brame, Joe A. Brame, Scofield & Associates, Richard E. Gerard, Lake Charles, for defendants-appellees.
Baggett, McCall, Singleton & Ranier, Drew Ranier, Lake Charles, for plaintiffs-appellees.
Before FORET, CUTRER and DOUCET, JJ.
CUTRER, Judge.
This appeal arises from a suit for damages incurred as a result of an intersectional vehicular collision.
The facts in this case are as follows:
On June 8, 1979, at approximately 5:00 P. M., plaintiff, Walter Chesson, Sr. (Walter), was driving the family automobile, with his wife, Dories Chesson (Dories), as a passenger, westerly on Louisiana Highway 3059 in Calcasieu Parish, Louisiana, approaching the intersection of La. 3059 and U. S. 171. This intersection forms a "T" as traffic on La. 3059 can only turn right (north) or left (south) onto U. S. 171. The intersection is controlled by semaphore traffic signals.
As Walter approached the intersection, the traffic signal controlling La. 3059 was red. Walter came to a stop. His light changed to green and he proceeded into the intersection with the intention of making a left turn so as to head south on U. S. 171. As he went into the intersection, his car was struck by the vehicle operated by defendant, Guy Dyess, who was proceeding north on U. S. 171.
The resulting impact overturned the Chesson vehicle twice with it landing on its roof. Walter was thrown out of the car and Dories was trapped inside. Several witnesses to the accident helped turn the Toyota over on its wheels and Dories was extracted by a rescue unit from Lake Charles. All parties suffered injuries and were transported by ambulance to a local hospital for treatment.
Walter and Dories filed suit to recover for their damages naming as defendants: Guy Dyess, individually (Dyess); Guy's Cash & Carry Lumber Co. (Guy's); his insurer, American Indemnity Company (American); and plaintiff's uninsured and/or underinsured insurance carrier, Insurance Company of North America (INA).
A third party demand was filed by Dyess, Guy's and American against the Louisiana Department of Transportation and Development (the Department), alleging that the accident was precipitated by a malfunctioning light. The Chessons also added the Department as a party defendant.
Before trial could be had, Dyess died and his succession representative was made a party defendant. Later, and still before trial, Walter and Dories settled their claims *188 against all defendants except the Department.[2]
Following trial, judgment was rendered against the Department in the amount of $152,198.99. From that judgment the Department appealed. We affirm.
On appeal the Department raises the following issues:
(1) Whether the trial court erred in finding that the semaphore traffic signal was malfunctioning at the time of the accident;
(2) Whether the trial court abused its discretion in determining the amount of damages awarded; and
(3) Whether the trial court erred, as a matter of law, by not proportionately reducing the amount of damages awarded due to plaintiffs' release of alleged joint tort-feasors.

MALFUNCTION OF TRAFFIC SIGNAL
The Department raises in its first assignment of error that the trial court erred in factually determining that the malfunctioning traffic signal caused the accident. The trial court considered the testimony of both plaintiffs' and defendant's witnesses concerning the traffic signal and concluded that the accident was caused by its malfunction.
Dories and Walter both testified that as they approached the intersection, the light showed red. They stopped and waited until the light turned green before proceeding into the intersection. Jerry Summers was proceeding north on U. S. 171 following the Dyess vehicle with one car intervening. Summers testified that as Dyess proceeded into the intersection, the light was showing green for Dyess. He stated that at the time of the impact the light changed to yellow.
This signal light had a history of malfunctioning. Five persons, who live in the vicinity of the light and who traveled through the intersection practically daily, testified that this signal regularly malfunctioned. Sam Tarleton, one of those local residents, testified that he had seen the light malfunction on numerous occasions prior to the accident. He stated that two days before the accident the signal was malfunctioning. He called the State Police each time he saw the malfunction. The most common malfunction was described by the witnesses as one where the light changes from green to red without the intermediate amber light coming on or that the amber light only comes on for just an instant. This was creating a dangerous condition as vehicles traveling on U. S. 171 would have no prior warning of the impending red light.
The state patrolman who investigated the accident stated that the light appeared to operate properly but did state that both drivers told him that they each had a green light.
William Sonnier, an apprentice electrician working for the Department on signal light maintenance, testified that he examined the light three days after the accident but found nothing wrong with it. He did state, however, that he had responded to numerous calls reporting this light to be malfunctioning or out of order prior to the accident. He also stated that it is possible for two signals to reflect the same color at the same time in different directions and that he had seen this occur.
After considering the evidence the trial judge concluded as follows:

"The Court must conclude that at the time of the accident, the traffic signals at the intersection of Highway 171 and Old Town Road [La. 3059] were functioning improperly so that both Walter O. Chesson and Guy Dyess were relying on green lights facing their respective lanes of traffic."

We have examined the record thoroughly and conclude that the evidence supports *189 the trial judge's conclusion that the signal light was malfunctioning at the time of the accident. We cannot say that the trial judge was clearly wrong in this conclusion.
The testimony also reflects that the Department had notice of the inadequacy of such equipment. Numerous reports of the prior malfunction were made to the State Police, the most recent being two days before the accident.
As a matter of law, a high degree of care must be exacted of those whose obligation it is to maintain traffic signals. This rule is well founded and thoroughly established by the very nature of things. The speed of and increasing volume of traffic on our highways poses added control problems to authorities charged with the obligation of its regulation. "The greater degree of volume of traffic, the greater is the need for effective vehicular control, which includes properly functioning signals upon which motorists may rely with confidence." McDaniel v. Welsh, 234 So.2d 833 (La.App. 1st Cir. 1970).
We conclude that the Department was negligent in not properly maintaining or replacing this signal after repeated malfunction problems occurred. Such negligence led to the existence of a malfunctioning light which was the cause of the accident in question. We agree that the trial court properly held the Department liable for plaintiffs' resulting injuries.

DAMAGES
The Department contends that the award of damages to Walter and Dories was excessive. We disagree.
The awards complained of appear in the judgment as follows:

"Pain and suffering of
Walter O. Chesson, Sr.,
disability and loss of
earnings $60,000.00
"Pain and suffering of
Dories Chesson, disability
and loss of earnings and
disfigurement 70,000.00"

The Department, in its brief, does not question the loss of earnings and refers to these two awards as general damages. We note that an element of special damages, "loss of earnings," is included in each of the awards. The loss of earnings is not itemized and we do not know what amount the trial judge may have attributed to the "loss of earnings." We have examined the record and find that there may have been some loss of earnings but such was insignificant compared to the general damages due to the injuries received by Walter and Dories. Even if the awards were solely general damages for personal injuries, the awards would not be excessive.
At impact, Walter was thrown from his car and suffered serious injuries. He was treated by Dr. David Drez, Jr., for "a fractured right third metacarpal shaft and an intertrochanteric fracture of the left hip which was minimally displaced." The left hip required surgery whereby a hinge-plate was attached to the shaft of the femur and the hip. This kept pressure on the bone to allow healing to take place. Walter was hospitalized for six days and remained on crutches for six weeks before he could put full pressure on the leg and hip. Walter, at the time of trial, had a slight limp on his left side, complained of pain and the inability to do heavy lifting and squatting which is required of a paint and body man. The pain of which Walter complains is not uncommon for his injuries. As the leg and hip have mended, surgical removal of the plate may be necessary as its presence, some two years after implantation, has caused Walter to experience pain from bursitis. This removal will require surgery and a hospital stay of two or three days with the patient's movements restricted to crutches for six weeks. Dr. Norman Morin examined Walter and noted that the fracture of the right third metacarpal resulted in a fifteen percent disability to his right hand and the hip injury resulted in a ten percent disability to his left hip.
Dories was seen by Dr. Clark Gunderson in the emergency room and noted *190 multiple injuries to her cervical spine. "Roentgenograms of the cervical spine showed a fracture of the ring of the first cervical vertebra; fracture through the pedicles of the seventh cervical vertebra and a complete dislocation of the body of the seventh cervical vertebra in relation to the first thoracic vertebra." There was no injury to the spinal cord. Dories was placed in a "halo skeletal traction device" (a device whereby a metal halo is surgically attached to the skull by screws) which immobilizes the head and neck and traction is applied to reduce the dislocation of the cervical spine. In effect, the body is maintained rigid and immobile. This was required for four weeks before a "posterior cervical fusion from C6 to T1 was performed by wiring the spinous processes posteriorly and bone grafting from the posterior pelvis." The patient was then placed back in traction and subsequently fitted with a cervical thoracic brace and discharged on August 1, 1979. Dories also sustained "a chipped fracture from the triquetrum as well as the lateral portion of the base of the fifth right metacarpal. In addition there was an avulsion fracture of the ulnar styloid process. This was treated with a splint to her right arm." Dr. Gunderson was pleased with her recovery and anticipated no further surgery.
Dr. Morin examined Dories in April 1980 and noted that she complained of a loss of rotational mobility of her neck. She also complained of pain in her right hand, wrist and forearm as well as in the top of her left hand. Dories also testified at trial to pain associated with her injuries as well as an impairment of her ability to perform household and other activities. Dr. Morin estimated Dories' injuries have resulted in a twenty-five percent partial permanent disability of the body as a whole with the right hand and wrist injury representing a five percent partial permanent disability of the right hand and wrist. He also noted that Dories would experience disabling neck pains from activities which require prolonged positions of the head and neck.
To buttress the Department's argument for reduction of the award, it cites several cases. We have examined them but do not deem it necessary to discuss the awards in those cases. LSA-C.C. art. 1934(3) gives the trial court and/or jury much discretion in the assessment of general damages. The Supreme Court in Reck v. Stevens, 373 So.2d 498, 499-500 (La.1979), states in regard to appellate review of such an award:
"`The primary question before the appellate court, then, is whether the judge or the jury in fixing the amount of the award has abused its great discretion vested in them by law.... [Prior decisional awards] relied upon may be similar in that each of them involve a similar injury such as broken arm, the loss of an eye or eyes, or the loss of some member of the body. Thereafter, however, the similarity ceases for each case is different, and the adequacy or inadequacy of the award should be determined by the facts or circumstances peculiar to the case under consideration. The primary purpose of the judge or jury in fixing the award in a personal injury case is to adequately compensate the injured person for his injury under the facts shown to exist in his case.'"
We cannot find from our perusal of the record that the trial court clearly abused its discretion in making the awards. Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1977). We find the awards to be adequate.

JOINT TORT-FEASORS: RELEASE
The Department urges that due to the release of the remaining defendants, it is entitled to a reduction of the awards proportionately. We disagree.
In order for the Department to be entitled to such a reduction, it must prove that the released defendants were joint tort-feasors with the Department. The mere allegation of negligence does not establish co-tort-feasor status. Richard v. Southwest Louisiana Hospital Association, 383 So.2d 83 (La.App. 3rd Cir. 1980), writ den., 385 So.2d 274 (La.1980). As we have previously noted, the sole cause of the accident in question was the malfunction of the *191 signal light. The Department's negligence was the cause of the accident. No other defendant was found to be at fault.
The Department cites Raley v. Carter, 401 So.2d 1006 (La.App. 1st Cir. 1981),[3] to support its contention that the released defendants must be considered joint tort-feasors and reduction allowed. In Raley, the reduction was allowed. The court pointed out that:
"In this case, there is no evidence in the record from which we may determine the negligence or non-negligence of the parties released."
The court in Raley held that since there was no evidence from which it could determine the negligence of the released parties, the plaintiff was bound by his pleadings and a reduction was allowed.
We distinguish Raley from the case at hand. The evidence conclusively reflects that the accident was caused solely by the negligence of the Department. The lack of negligence of the released defendants was also proven. The equitable result reached in Raley is not applicable to the facts at hand. The Department's claim for reduction will be disallowed. In conclusion, we note that the trial judge assessed costs of the trial court as follows:
"... insofar as applicable, costs are assessed against the said Defendant State of Louisiana through the Department of Transportation and Development."

This portion of the trial court judgment must be amended in order to comply with LSA-R.S. 13:5112(A) which requires that a judgment for costs assessed against the State shall set forth such costs in a dollar amount. The trial court judgment shall be amended to comply with this statute.
For the reasons assigned, the judgment of the trial court against the State of Louisiana through the Department of Transportation and Development is amended to fix all costs of the trial court against the State of Louisiana through the Department of Transportation and Development, pursuant to LSA-R.S. 13:5112(A) in the sum of $1,107.25 . In all other respects, the judgment of the trial court is affirmed.
Costs of this appeal are fixed in the amount of $385.00 and are to be paid by the State of Louisiana through the Department of Transportation and Development.
AMENDED AND AFFIRMED.
NOTES
[1] The name in the caption is in error. "Warren O. Chesson's" name is properly referred to in pleadings in the record as "Walter O. Chesson." We shall use the correct name in this opinion.
[2] The settlement reserved plaintiffs' rights against the Department and would hold harmless defendants for the first $80,000.00 in a judgment and would equally divide any judgment in excess of $80,000.00 between plaintiffs and defendants. Defendants would apportion their half in proportion to the amount each contributed to the settlement figure.
[3] Writs were granted in this case on October 16, 1981. The writs are pending at this time. See 406 So.2d 616 (La.1981).