# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### JULY 22, 2004 Session

## BRIAN DEAS, ADMINISTRATOR v. STATE OF TENNESSEE

**Direct Appeal from the Tennessee Claims Commission**
**No. 20-100-413      Nancy Miller-Herron, Commissioner**

---

**No. W2003-02891-COA-R3-CV - Filed November 19, 2004**

---

This case involves a wrongful death action filed against the State of Tennessee in the Tennessee Claims Commission pursuant to Tennessee Code Annotated section 9-8-307(a)(1)(I) and (J). Appellant is the administrator of the estate of the deceased driver of an automobile involved in a collision with another vehicle on a state highway. Following a hearing, the Commissioner ruled that the state was negligent under section 9-8-307(a)(1)(I) in inspecting and maintaining the section of highway at issue, the shoulder of the highway did not constitute a dangerous condition under section 9-8-307(a)(1)(J), the Appellant failed to prove that the condition of the highway was the proximate cause of the decedent's untimely death, and the Appellant was not entitled to recover because decedent's negligence in causing the accident was at least fifty percent (50%). The Appellant filed a notice of appeal to this Court, arguing that the Commissioner's findings constitute error. For the reasons stated herein, we affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Claims Commission Affirmed**

ALAN E. HIGHERS, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and DAVID R. FARMER, J., joined.

Everett B. Gibson, Memphis, TN; Patrick J. Smith, Columbus, OH, for Appellant

Paul G. Summers, Attorney General and Reporter, Michael E. Moore, Solicitor General, Rebecca Lyford, Assistant Attorney General, Nashville, TN, for Appellee

**OPINION**

**Factual Background and Procedural History**

On September 28, 1999, Leslie Yovan ("Decedent"), a young attorney from Ohio, was traveling westbound on Highway 57 in McNairy County, Tennessee, on her way to the Memphis airport to catch a return flight to Ohio. Mr. James Chaney ("Mr. Chaney") was driving his employer's truck eastbound on Highway 57 on his way to a factory. Shortly after rounding a curve on Highway 57, Decedent's right tires entered onto the shoulder of the highway. While attempting to steer back onto the paved surface, Decedent lost control of her vehicle and drove into the path of Mr. Chaney's truck. Mr. Chaney was unable to stop in time and collided with the passenger side of Decedent's car, resulting in her death.

Highway 57 is a state highway constructed and maintained by the Tennessee Department of Transportation ("TDOT"), a department of the State of Tennessee. The American Association of State Highway and Transportation ("AASHTO") creates standards governing, among other things, the shoulders of roadways. The AASHTO standards require that the shoulder of the roadway remain level with the paved surface traversed by motor vehicles. These standards have been adopted by TDOT and applied to Tennessee's state highway system. At the time of this accident, the shoulder on Highway 57 where this accident occurred was gravel.[1] Over time, the gravel along the highway would dissipate due to normal wear and settlement. Throughout any given year, TDOT would readjust the gravel shoulder along Highway 57 in order to make it flush with the paved surface. In addition to the gravel shoulders, this particular stretch of highway did not have any signs posted warning motorists of a drop-off along the shoulder.

On September 12, 2000, Brian Deas ("Administrator"), the duly appointed administrator of Decedent's estate, filed a wrongful death action against TDOT with the Tennessee Claims Commission.[2] Administrator alleged that TDOT's negligence in constructing and maintaining Highway 57, as well as its failure to warn motorists of a drop-off, combined to cause the death of Decedent. Specifically, Administrator alleged that the depth of the drop-off on this particular stretch

---

[1] In July 2000, TDOT paved the shoulders along Highway 57 where this accident occurred. According to Stan Reynolds, a TDOT crew manager working in McNairy County at the time, the paving effort was part of a larger initiative launched by the state in 1994 to save costs associated with continuously readjusting the gravel shoulders along the state's highways. The state offered no objection to Mr. Reynolds' testimony regarding the paving initiative at trial.

[2] The Tennessee General Assembly created the Tennessee Claims Commission and vested it with the authority to hear monetary claims filed against the state based upon the conduct of state employees. Tenn. Code Ann. §§ 9-8-301, -305 (2003); *see also Stewart v. State*, 33 S.W.3d 785, 790 (Tenn. 2000). The Commission has exclusive jurisdiction to hear claims pertaining to negligence in the design, inspection, and maintenance of state highways, as well as suits alleging the existence of a dangerous condition on such highways. Tenn. Code Ann. § 9-8-307(a)(1)(I)–(J) (2003). "For causes of action arising in tort, the state shall only be liable for damages up to the sum of three hundred thousand dollars ($300,000) per claimant and one million dollars ($1,000,000) per occurrence." Tenn. Code Ann. § 9-8-307(e) (2003).

of highway caused Decedent to lose control of her car and enter into the path of Mr. Chaney's truck. The state filed an answer alleging as an affirmative defense that Decedent's negligence in operating her vehicle barred recovery under Tennessee's comparative fault system.[3]

Commissioner Nancy Miller-Herron held a hearing on Administrator's claim on June 10, 2003, and she issued her ruling on October 23, 2003. The greatest area of contention between the parties during the proceedings below concerned the exact depth of the drop-off on this particular stretch of highway and whether the drop-off or driver error caused the Decedent to lose control of her vehicle. After hearing all the testimony and reviewing the exhibits offered by the parties, the Commissioner noted in her judgment that the testimony and exhibits reflected a wide divergence of possible depths, ranging from less than one inch up to nine inches. The Commissioner's judgment contained the following findings of fact and conclusions of law: (1) the shoulder drop-off on Highway 57 had a depth of between two and three inches; (2) this two to three inch drop-off did not constitute a "dangerous condition" under section 9-8-307(a)(1)(J); (3) the drop-off was not the proximate cause of Decedent's death; and (4) Decedent was at least fifty percent (50%) at fault in causing the accident, thereby barring recovery under Tennessee's comparative fault system.

Administrator filed an appeal to this Court and presents the following issues for our review:

I.      Whether the state's negligence in maintaining the shoulder of the highway under section 9-8-307(a)(1)(I) of the Tennessee Code, including the failure to warn motorists of a low shoulder, is the proximate cause of Decedent's death;
II.     Whether the condition of the highway shoulder under the facts presented in this case constitutes a "dangerous condition" under section 9-8-307(a)(1)(J) of the Tennessee Code;
III.    Whether a presumption of due care applies to Decedent's act of driving onto the shoulder of the highway;
IV.     Whether the "sudden emergency doctrine" should apply when the operator of a motor vehicle allows her vehicle to cross over the fog line and onto the shoulder of the highway, and there is no competent proof that she was negligent in doing so; and
V.      Whether the evidence preponderates against the Commissioner's finding of negligence of at least fifty percent (50%) on the part of Decedent.

**Standard of Review**

The legislature provided that the decisions of the Tennessee Claims Commission are appealable to this Court as follows:

> The decisions of the individual commissioners or, when rendered, decisions of the entire commission regarding claims on the regular

---

[3] "The state may assert any and all defenses, including common law defenses, which would have been available to the officer or employee in an action against such an individual based upon the same occurrence." Tenn. Code Ann. § 9-8-307(d) (2003).

docket may be appealed to the Tennessee court of appeals pursuant to the same rules of appellate procedure which govern interlocutory appeals and appeals from final judgments in trial court civil actions
. . . .

Tenn. Code Ann. § 9-8-403(a)(1) (2003).  Accordingly, we are bound by the following standard of review:

Since this is a nonjury case, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the Commission.  Unless the evidence preponderates against the findings we must affirm, absent error of law.

*Sanders v. State*, 783 S.W.2d 948, 951 (Tenn. Ct. App. 1989) (quoting *Learue v. State*, 757 S.W.2d 3, 6 (Tenn. Ct. App. 1987)); *see also* Tenn. R. App. P. 13(d) (2003).  "Because the [Commissioner] is in a better position to weigh and evaluate the credibility of the witnesses who testify orally, we give great weight to the [Commissioner's] findings on issues involving credibility of witnesses." *Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996) (citing *Gillock v. Bd. of Prof'l Responsibility*, 656 S.W.2d 365, 367 (Tenn. 1983)).  "[W]hen we review factual findings under Tenn. R. App. P. 13(d), we will not reverse findings that hinge on the witnesses' credibility unless the record contains clear, concrete, and convincing evidence necessarily negating witness credibility." *Pool v. State*, 987 S.W.2d 566, 569 (Tenn. Ct. App. 1998).

### Proximate Causation

On appeal, Administrator argues that the Commissioner erred in failing to find that the negligent maintenance of the highway shoulder by the state was the proximate cause of Decedent's death.  At trial, both sides conceded that Decedent overcorrected as she drove her vehicle back onto the roadway.  The parties disagree, however, on what caused Decedent to overcorrect.

In order for Administrator to prove a cause of action based on the state's negligence, he must prove the following elements:

(1) a duty of care owed by the defendant to the plaintiff; (2) conduct falling below the applicable standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate, or legal, cause.[4]

*McClenahan v. Cooley*, 806 S.W.2d 767, 774 (Tenn. 1991) (citations omitted).  "[I]t is not enough to prove the existence of a dangerous condition on the highway, pursuant to Tenn. Code Ann. § 9-8-307(a)(1)(J), or to prove that the State negligently approved, constructed, and maintained the

---

[4] We are not asked on appeal to examine the Commissioner's finding that the state was negligent in maintaining the roadway at issue under section 9-8-307(a)(1)(I) of the Tennessee Code.

highway, pursuant to Tenn. Code Ann. § 9-8-307(a)(1)(I)." *Belcher v. State*, No. E2003-00642-COA-R3-CV, 2003 Tenn. App. LEXIS 827, at *15–16 (Tenn. Ct. App. Nov. 25, 2003). The plaintiff must also prove that those conditions were the cause-in-fact and the proximate cause of the accident. *Id*. at *16. Our supreme court has formulated the following three-prong test for determining whether a defendant's negligence constitutes a proximate cause of the plaintiff's injury:

> (1) the tortfeasor's conduct must have been a "substantial factor" in bringing about the harm complained of; and (2) there is no rule or policy that should relieve the wrongdoer from liability because of the manner in which the negligence has resulted in the harm; and (3) the harm giving rise to the action could have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence.

*McClenahan*, 806 S.W.2d at 775 (citations omitted).

The evidence presented in this case clearly demonstrated that a drop-off existed in the shoulder of the roadway where the accident occurred. The testimony from Administrator's own witnesses, however, undermines the contention that this drop-off was a substantial factor in causing Decedent to overcorrect. Administrator's expert, Dr. Leighton Sissom ("Dr. Sissom"), testified that Decedent overcorrected because the drop-off put pressure on the wheels of Decedent's vehicle as she attempted to re-enter the roadway. He also stated, however, that he would expect to find evidence of "scrubbing" on the tires and pavement where this contact occurred. When asked if he found any evidence of "scrubbing" in this case, Dr. Sissom testified that he had nothing other than Mr. Chaney's statements that the vehicle's tires rubbed against the pavement. Dr. Sissom also testified that over-correction depends on many factors, and he could not state at what depth a drop-off would cause an over-correction. Mr. Nate Lenow, a private investigator hired by Administrator to investigate this accident, testified that he went to the scene of the accident on October 11, 1999. Mr. Lenow testified that he saw some markings on the pavement, but could not say that they came from the Decedent's car. Mr. Lenow also went to view Decedent's car after this accident and stated that he looked for cuts and scrapes on the tires, but he saw none. Jimmy Lambert ("Trooper Lambert"), a state trooper with the Tennessee Highway Patrol, investigated this accident. Trooper Lambert testified that he found yaw marks where Decedent attempted to re-enter the roadway, and he found that Decedent's vehicle started sliding sideways before it came back onto the pavement. Administrator alleges on appeal that there is no evidence showing Decedent applied her brakes and that the Commissioner failed to consider the testimony of Mr. Chaney, the only eye-witness.[5]

"The State has a duty to exercise reasonable care under all the attendant circumstances in planning, designing, constructing and maintaining the State system of highways." *Goodermote v.*

---

[5] Mr. Chaney's deposition testimony was introduced as an exhibit at the proceeding before the Commissioner since he lives in Texas and was unable to attend the trial. As such, we "may make an independent assessment of the credibility of the documentary proof . . . without affording deference to the trial court's findings." *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783–84 (Tenn. 1999).

*State*, 856 S.W.2d 715, 720 (Tenn. Ct. App. 1993) (citing Tenn. Code Ann. § 9-8-307(a)(1)(I)). This policy is reflected in the industry standards adopted by TDOT, as testified to by the state's own witness, requiring that the shoulders of state highways remain flush with the traveling surface. Although one representative from TDOT testified that TDOT received no complaints concerning the drop-off from Highway 57 prior to this accident, another TDOT employee stated that they have to "pull" the gravel shoulders two to three times per year to keep it level with the roadway.

> The foreseeability requirement is not so strict as to require the tortfeasor to foresee the exact manner in which the injury takes place, provided it is determined that the tortfeasor could foresee, or through the exercise of reasonable diligence should have foreseen, the general manner in which the injury or loss occurred. "The fact that an accident may be freakish does not per se make it unpredictable or unforeseen." It is sufficient that harm in the abstract could reasonably be foreseen.

*McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn. 1991) (citations omitted). While an accident of this nature is clearly foreseeable based upon the inferences to be drawn from the testimony of the state's own witnesses, Administrator failed to demonstrate that the shoulder of the highway was a substantial factor in bringing about this accident under the test formulated in *McClenahan*. *Cf. Goodermote*, 856 S.W.2d at 722–23.

Our review of the record reveals that the Commissioner thoroughly reviewed and weighed each witnesses' testimony regarding the cause of this accident. Issues of proximate causation are left to the discretion of the trier of fact. *McClenahan*, 806 S.W.2d at 775. "Resolving the conflicting testimony of experts falls within the province of the trier of fact." *Atkins v. State*, No. E2003-01255-COA-R3-CV, 2004 Tenn. App. LEXIS 240, at *16 (Tenn. Ct. App. Apr. 14, 2004) (citing *State v. Flake*, 88 S.W.3d 540 (Tenn. 2002)). The Commissioner's opinion clearly indicates that she considered Mr. Chaney's testimony by assessing its effect on Dr. Sissom's conclusions. The evidence in this case does not preponderate against the Commissioner's finding that Administrator failed to prove by a preponderance of the evidence that the drop-off between the shoulder and the roadway was the proximate cause of Decedent's death.

### The Shoulder Drop-off as a Dangerous Condition

Administrator asserts that the Commissioner failed to consider the depth of the drop-off along the entire 150 foot section of Highway 57 at issue in this case. According to Administrator, the Commissioner only considered the evidence relating to the depth of the drop-off where Decedent's vehicle re-entered the roadway. Administrator argues the Commissioner failed to take into account Mr. Chaney's testimony, showing that the drop-off where Decedent's vehicle first entered the shoulder was much deeper.

Tennessee Code Annotated section § 9-8-307(a)(1)(J) does not set forth what will qualify as a "dangerous condition." *Sweeney v. State*, 768 S.W.2d 253, 255 (Tenn. 1989). In *Sweeney*, our supreme court stated that the following factors should be considered when determining whether a "dangerous condition" exists on a state highway under the statute: (1) the physical aspects of the roadway, (2) the frequency of accidents on a particular stretch of roadway, and (3) the testimony of expert witnesses in arriving at this factual determination. *Id.* (citing *Holmes v. Christopher*, 435 So.2d 1022 (La. App. 4th Cir. 1983)).

Regarding the physical aspects of the roadway, the Commissioner's findings do state that her focus was upon the point where Decedent's vehicle reentered the roadway. The emphasis on this location, however, is warranted given the evidence presented in this case. As noted by the Commissioner, the testimony from all of the witnesses regarding the exact depth of the shoulder was very contradictory. Mr. Chaney, the only eye-witness to the accident, testified on direct examination that the drop-off where Decedent's car first left the roadway was approximately six to eight inches. On cross-examination, however, Mr. Chaney admitted that he could not accurately state what the depth of the drop-off was because he did not walk over and inspect or measure the drop-off following the accident, but merely viewed it from a distance. In addition, none of the witnesses who investigated this accident, including Administrator's own expert, was able to determine the exact location of where Decedent's vehicle left the roadway. There was also conflicting testimony regarding the shape of the drop-off and its potential effect on Decedent's vehicle.

Mr. Richard Lambert, who lives along this particular stretch of Highway 57, testified regarding the frequency of accidents. Mr. Lambert testified that five to six accidents have occurred along the highway over a period of thirteen years, but he could not say what caused the other wrecks. Mr. Lambert stated that of all the accidents that did occur on this particular stretch of roadway, none of those vehicles overcorrected and crossed into the other lane of traffic. Mr. Stan Reynolds, a TDOT employee, testified that prior to this accident he was not aware of anyone being injured in an automobile accident due to a drop-off on the shoulder of this particular highway.

The crucial factor, based upon the testimony of Administrator's own expert witness, was the point at which the vehicle's tires made contact with the drop-off to produce an over-correction. Dr. Sissom, in an attempt to show the importance of the drop-off's effect on Decedent's second attempt to re-enter the roadway, provided the following testimony:

> Q. All right. Now, let's turn to the opinions you stated on the second page of Trial Exhibit 16. What happened after the vehicle driven by Ms. Yovan left the pavement and ended up on the shoulder in your opinion?
>
> A. My belief is she experienced this startle factor that I talked about a moment ago. When the vehicle went off the pavement, suddenly she startled, got to do something (sic). Tried to steer left. According to the deposition of Mr. Chaney, saw that she didn't succeed. Tried to steer left again.

> Did succeed, but had done it too much — had steered too
> much by that time and came back up on the roadway. In the
> meantime traveled some two seconds, according to Mr.
> Chaney, at whatever her speed was on the shoulder of the
> road.

Administrator directs our attention to Mr. Chaney's testimony that after the accident he walked over to the ambulance and was able to observe the depth and condition of the shoulder. Mr. Chaney's own testimony, describing how the Decedent overcorrected on her second attempt to re-enter the roadway, strengthens the Commissioner's reliance on the location where Decedent's car re-entered the roadway to resolve the critical factual issue; whether the tires of Decedent's vehicle hitting the drop-off or driver error caused the accident *at the moment of over-correction*.

After thoroughly reviewing the record in this case, we cannot say that the evidence preponderates against the Commissioner's factual finding that the drop-off where Decedent re-entered the roadway was not a dangerous condition under section 9-8-307(a)(1)(J).

## Comparative Fault

We note that the final issues raised by Administrator on appeal focus upon the Commissioner's application of Tennessee's comparative fault system.

> Many traditional, common-law tort concepts lost their independent
> existence after the Tennessee Supreme Court embraced the doctrine
> of comparative fault in *McIntyre v. Balentine*, 833 S.W.2d 52 (Tenn.
> 1992). In the years since the *McIntyre* decision, the contributory
> negligence doctrine, the last clear chance doctrine, the sudden
> emergency doctrine, the rescue doctrine, and the doctrine of
> secondary implied assumption of the risk have been merged into the
> comparative fault scheme and are simply factors to consider when
> apportioning fault among the parties.

*Winstead v. Goodlark Reg'l Med. Ctr., Inc.*, No. M1997-00209-COA-R3-CV, 2000 Tenn. App. LEXIS 230, at *8–9 (Tenn. Ct. App. Apr. 4, 2000) (citations omitted); *see also McCall v. Wilder*, 913 S.W.2d 150, 157 (Tenn. 1995). Therefore, we combine these issues and discuss them collectively in this section of the opinion.

Administrator first argues that the Commissioner failed to consider whether a presumption of due care existed as to Decedent's action in driving onto the shoulder of the roadway. Administrator first raised the issue with the trial court in his post-trial brief, but the Commissioner's opinion does not state whether she considered this doctrine when allocating the fault between the parties. Since the Commissioner made no factual findings regarding this issue, we review the record

*de novo* to determine whether the presumption of due care should be taken into consideration when allocating fault. *Brooks v. Brooks*, 992 S.W.2d 403, 404–05 (Tenn. 1999).

Administrator relies on our supreme court's decision in *Memphis Light, Gas & Water v. Goss*, where the court stated that "[i]n the absence of any proof as to what caused [a driver] to veer her car onto the . . . shoulder of the road, the presumption is that she was exercising proper care for her own safety but such presumption is no evidence of [the defendant's] negligence." *Memphis Light, Gas & Water Div. v. Goss*, 494 S.W.2d 766, 769 (Tenn. 1973) (citing *Stinson v. Daniel*, 414 S.W.2d 7, 9 (Tenn. 1967)). "[T]he presumption of due care is a rebuttal presumption and one of fact." *Id*. at 770. "The presumption of due care has application only in the absence of evidence, either direct or circumstantial, showing how the injury was received, and the presumption disappears when such evidence is produced." *Keith v. Keith*, 741 S.W.2d 911, 913 (Tenn. Ct. App. 1987) (citing *Nichols v. Smith*, 111 S.W.2d 911 (Tenn. 1937)); *see also Seahorn v. Karr*, 242 S.W.2d 331, 334 (Tenn. Ct. App. 1951).

Conversely, "Tennessee has long recognized that the doctrine of *res ipsa loquitur* is applicable to certain automobile accidents." *Hudson v. Stepp*, 393 S.W.2d 301, 302 (Tenn. Ct. App. 1965). In setting forth the parameters of the doctrine as it applies to automobile accidents, we have stated:

> The maxim *res ipsa loquitur* means that the facts of the occurrence evidence negligence; the circumstances unexplained justify an inference of negligence. In the principle of proof employed, a case of *res ipsa loquitur* does not differ from an ordinary case of circumstantial evidence. *Res ipsa loquitur* is not an arbitrary rule but rather a "common sense appraisal of the probative value of circumstantial evidence." *Boykin v. Chase Bottling Works*, [222 S.W.2d 889, 896 (Tenn. Ct. App. 1949)].
>
> This maxim does not generally apply to motor vehicle accidents, but it may apply to such an accident where the circumstances causing it were within driver's control and the accident was such as does not usually occur without negligence. So where a motor vehicle, without apparent cause, runs off the road and causes harm, the normal inference is that the driver was negligent, and *res ipsa loquitur* is usually held to apply.

*Sullivan v. Crabtree*, 258 S.W.2d 782, 784 (Tenn. Ct. App. 1953). The application of the *res ipsa loquitur* doctrine merely permits the fact finder "to choose the inference of defendant's negligence in preference to other permissible or reasonable inferences." *Id*. at 785.

In the present case, Administrator's own expert thwarted the application of a presumption of due care when he testified as follows:

> Q.     Now, it is her fault that she went off the road; is that correct?

A.     Well, she was at the wheel, so clearly she was driving the car
       when it went off the road.

Q.     And it was her fault; is that correct?

A.     Yes.

The state's expert testified that he found no evidence Decedent was impaired, and he too attributed Decedent's action in leaving the roadway to driver error. Mr. Chaney testified that Decedent, in his opinion, was not speeding when she ran off the roadway, but he offered no testimony as to why her vehicle suddenly left the roadway and entered onto the shoulder. Trooper Lambert testified that he walked back up the roadway about 200 feet from the point where the vehicle re-entered the pavement, but he did not notice any road hazards that could have caused Decedent to leave the roadway. Sergeant Tony Scott with the Tennessee Highway Patrol testified that he looked inside Decedent's car after the accident and noticed an apple with a fresh bite out of it, suggesting that Decedent was eating while driving.

In his brief, Administrator has argued for the application of decisions reached by the appellate courts of Louisiana. After reviewing these decisions, we have determined that they are unpersuasive and actually undermine Administrator's position.[6] Based upon our review of the record and applicable Tennessee law, we find that there is sufficient circumstantial evidence in this case to rebut

---

[6] Administrator cited to *Rue v. State*, 372 So.2d 1197 (La. 1979), and *Payne v. Louisiana Department of Transportation*, 424 So.2d 324 (La. Ct. App. 1982). Administrator asserts that these cases stand for the proposition that "driving onto a shoulder in and of itself is not negligence that bars a recovery for injuries caused by a defective shoulder." Subsequent Louisiana cases, however, have effectively overruled *Rue* and its progeny:

> The trial judge found that Gantt's inadvertent straying from the highway did not constitute negligence under *Rue v. State Department of Highways, supra*. The supreme court in *Rue* held that inadvertent straying onto the shoulder did not constitute such substandard conduct as to bar a motorist[']s recovery in a defective shoulder case.
>
> *Rue* is no longer viable in light of the subsequent adoption of comparative fault. . . . We believe one of the major reasons for the result reached in *Rue* was the harshness of the total bar to recovery which resulted from the application of contributory negligence. In order to avoid this harsh result, the Court concluded the conduct of the motorist in inadvertently straying off the road did not constitute negligence which would bar recovery. We believe the major policy considerations behind *Rue* were . . . to provide the State with an economic incentive to maintain highway shoulders in a safe condition and to place liability upon the State, whose conduct created a far greater risk of harm to others than did the motorist's conduct. Like the court in *Turner*, we believe these legitimate interests can now be accomplished by the application of comparative fault, which has the additional advantage of achieving a more equitable result, with each party bearing the burden of its proportionate degree of fault. Accordingly, the rule established in *Rue* is no longer necessary. For these reasons, we agree with the trial court's conclusion that such cases are now governed by the comparative fault doctrine [under the Louisiana Code].

*Hood v. State*, 587 So.2d 755, 759–60 (La. Ct. App. 1991) (citing *Motton v. Travelers Ins. Co.*, 484 So.2d 816 (La. Ct. App. 1986)); *see also Cullivan v. State Farm Mut. Auto. Ins. Co.*, 428 So.2d 1231, 1238 (La. Ct. App. 1983).

-10-

the presumption of due care. "[T]he presumption that deceased was acting with due care is contradicted by the fact that a vehicle under her control veered off the pavement . . . and into the path of an oncoming vehicle." *Keith v. Keith*, 741 S.W.2d 911, 913 (Tenn. Ct. App. 1987). The *res ipsa loquitur* doctrine also permits us to infer negligence on the part of Decedent in bringing about the accident. *See Sullivan*, 258 S.W.2d at 784.

Next, Administrator argues that the Commissioner erred in ruling that the "sudden emergency doctrine" was inapplicable in this case because Decedent contributed to the creation of the alleged emergency. The Tennessee Supreme Court has described the "sudden emergency doctrine" as follows:

> The sudden emergency doctrine, which has now been subsumed into Tennessee's comparative fault scheme . . . recognizes that a person confronted with a sudden or unexpected emergency which calls for immediate action is not expected to exercise the same accuracy of judgment as one acting under normal circumstances who has time for reflection and thought before acting. . . .The doctrine no longer constitutes a defense as a matter of law but, if at issue, must be considered as a factor in the total comparative fault analysis.

*McCall v. Wilder*, 913 S.W.2d 150, 157 (Tenn. 1995). "One who has contributed to the creation of the alleged emergency cannot rely on the sudden emergency doctrine." *Knowles v. State*, 49 S.W.3d 330, 337 (Tenn. Ct. App. 2001) (citing *Kowalski v. Eldridge*, 765 S.W.2d 746, 749 (Tenn. Ct. App. 1988)).

Motorists using the roadways in this state have a duty both to maintain control of their vehicles and to maintain a proper lookout. *See* Tenn. Code Ann. § 55-8-123(1) (2003). As stated above, the mere fact that Decedent's vehicle left the roadway for no apparent reason allows the Commissioner to infer negligence on the part of the driver. *Sullivan*, 258 S.W.2d at 784; *see also Cox v. Anderson County Highway Dep't*, No. E1999-01697-COA-R3-CV, 2000 Tenn. App. LEXIS 136, at *23–24 (Tenn. Ct. App. Mar. 7, 2000). As such, it was not error for the Commissioner to refuse to consider the "sudden emergency doctrine" in the overall comparative fault analysis. *Compare Sullivan v. Crabtree*, 258 S.W.2d 782, 784 (Tenn. Ct. App. 1953) *and Keith v. Keith*, 741 S.W.2d 911, 913 (Tenn. Ct. App. 1987) *with Shivers v. Ramsey*, 937 S.W.2d 945, 949–50 (Tenn. Ct. App. 1996).

We finally turn to Administrator's argument that the Commissioner erred in finding that Decedent was 50% or more at fault in causing the accident. (Appellant's Br. at 24). We review the Commissioner's factual findings in this regard *de novo* with a presumption of correctness. *Cross v. City of Memphis*, 20 S.W.3d 642, 645 (Tenn. 2000). Although Dr. Sissom testified that he believed the condition of the shoulder was the sole cause of Decedent's accident, he also admitted that Decedent's inattentive driving could have caused her to overcorrect. Dr. Sissom stated that a prudent driver who encountered a drop-off should reduce their speed, gently apply the brakes, and slowly attempt to re-enter the roadway. He testified that if Decedent had slowed down enough he

would not expect to see an over-correction. This testimony by Administrator's expert was supported by the testimony from the state's expert. Mr. Grim opined that driver error caused this accident, and he testified that both the Tennessee and Ohio driver's manuals advise drivers who encounter a drop-off to execute the procedure described by Dr. Sissom.

The trier of fact has considerable discretion when allocating fault among negligent parties. *Wright v. City of Knoxville*, 898 S.W.2d 177, 181 (Tenn. 1995); *see also Atkins v. State*, No. E2003-01255-COA0-R3-CV, 2004 Tenn. App. LEXIS 240, at *18 (Tenn. Ct. App. Apr. 14, 2004). The Commissioner, as evidenced by her twenty-six page opinion, thoroughly reviewed the testimony of the witnesses and each exhibit before reaching her decision in this case. Upon reviewing the record, we find that the evidence does not preponderate against the Commissioner's finding that Decedent was 50% or more at fault in this cause, thereby barring recovery under our comparative fault system. *See McIntyre v. Balentine*, 833 S.W.2d 52, 57 (Tenn. 1992); *Cox*, 2000 Tenn. App. LEXIS 136, at *23–24.

### Conclusion

For the reasons stated above, the judgment of the Tennessee Claims Commission in favor of the State of Tennessee is affirmed. Costs of this appeal are taxed against Appellant, Brian Deas, and his surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, JUDGE